# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

LINEUP SYSTEMS CORPORATION, )
 )
 Plaintiff and Counterclaim- ) C.A. No. N25C-07-045 KMM
Defendant, ) CCLD
 )
 v. )
 )
LEE ENTERPRISES INCORPORATED )
 )
 Defendant and Counterclaim-
Plaintiff.

Submitted: January 16, 2026
Decided: March 31, 2026

*Plaintiff's Partial Motion for Judgment on the Pleadings – **DENIED***

## <u>MEMORANDUM OPINION AND ORDER</u>

David H. Holloway, SHLANSKY LAW GROUP, LLP, Wilmington, Delaware; Frances F. Workman, David J. Shlansky (argued), SHLANSKY LAW GROUP, LLP, Chelsea, Massachusetts, *Attorneys for Plaintiff and Counterclaim-Defendant Lineup Systems Corporation.*

Christopher N. Kelly, Daniel M. Rusk, Heather S. Towsend, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Ian J. Russell (argued), LANE & WATERMAN LLP, Davenport, Iowa *Attorneys for Defendant and Counterclaim-Plaintiff Lee Enterprises, Incorporated.*

**Miller, J.**

# I.    INTRODUCTION

Lee Enterprises Incorporated ("Lee") contracted with Lineup Systems Corporation ("Lineup") for a comprehensive advertising management software service.  During the parties' precontractual discussions, Lineup represented that its software provided specific capabilities that Lee wanted.  Thereafter, the parties executed multiple agreements relating to the functions of the software and the support services that Lineup provides with it.  After Lineup delivered the software, Lee discovered the that the represented capabilities were non-existent and that Lineup did not have the ability to deliver them.

Lineup initiated this litigation and Lee filed Counterclaims.  At issue here are Lee's Counterclaims for fraudulent inducement (Count I), fraudulent concealment (Count II), and in the alternative, breach of contract (Count III).  Lineup moved for judgment on the pleadings under Rule 12(c), seeking judgment in its favor on these Counts (the "Motion").

Lineup argues that the integration clause in the parties' agreements bars Lee's fraud claims.  Absent an anti-reliance provision, a fraud claim will be barred if the parties' agreement directly contradicts the extracontractual misrepresentations.  Lineup's alleged misrepresentations are not contradicted by language in the parties' agreement, therefore, the integration clause does not bar Lee's fraud claims.

Lineup next attacks the fraud claims individually contending that the fraudulent inducement claim fails to support a reasonable inference that Lineup knew its representations were false or were made with reckless indifference. It further contends that Lee fails to support its fraudulent concealment claim with allegations of an affirmative act of concealment. Knowledge (or reckless indifference) may be averred generally. Lee's allegations support a reasonable inference that Lineup, as the software's developer, knew its capabilities and thus knew that representations of capabilities that it did not have, were false. Conversely, an affirmative act of concealment must be pled with particularity. Lee supports its concealment claim with allegations of the time, place, and contents of Lineup's efforts to conceal the software's inability to function as represented and Lineup's inability to provide the functions promised.

Lineup additionally contends that the fraudulent inducement claim is impermissibly bootstrapped to Lee's breach of contract claim. Lee's allegations of inducement are of precontractual representations and are supported by a different damages model, sufficient to escape the anti-bootstrapping rule.

Because Lee's fraud claims are not barred by the parties' integration clause, are adequately pled as to scienter and affirmative concealment, and the fraudulent inducement claim is not impermissibly bootstrapped to Lee's breach of contract claim, Lineup's Motion as to the fraud claims is *DENIED.*

3

Lineup also seeks judgment on Lee's breach of contract claim, which is pled in the alternative. Lee's factual allegations support a reasonably conceivable breach of Lineup's obligations under the parties' agreements. Accordingly, Lineup's Motion is **DENIED** on this count as well.

## II. FACTUAL BACKGROUND[1]

### A. *Lee's request for proposal*

Lee is a media company that provides local news, through local newspapers, in approximately 25 states.[2] In 2021, Lee started looking for an advertising and sales management software service.[3] To begin its search, Lee solicited bids through Request for Proposals (the "RFPs").[4] The RFPs outlined Lee's needs, including a customer management system and order management system.[5] Lineup responded to Lee's RFPs offering its software, Adpoint. According to Lineup, Adpoint encompassed "a single system of record covering lead generation, multichannel ad booking,…revenue recognition, accruals and deferrals, billing, and reporting."[6]

---

[1] The following facts are derived from the parties' pleadings and the documents incorporated therein. D.I. 1 ("Compl."), D.I. 16 ("Ans."), and D.I. 16 ("Countercl.").
[2] Compl. ¶ 6; Ans. ¶ 6.
[3] *See* Countercl. ¶ 6.
[4] *See id.*¶¶ 5–6.
[5] *Id.* ¶ 6.
[6] *Id.*

4

## B.    *Lineup's demonstrations*

Talks between the parties progressed, and on October 15, 2021, Lineup demonstrated the Adpoint system with an emphasis on its financial functions (the "October Demo"). During the October Demo, Lineup represented that billing options and revenue recognition are completely separated and that Adpoint allowed for different revenue recognition templates to apply automatically, based on the type of revenue and the products or services sold.[7] To illustrate this concept, 40 minutes into the October Demo, a Lineup representative stated "this line item has this one revenue recognition template applied and that automatically applied based upon the product that I was offering to my customer…. You can see that it's going to recognize all of that money…based on the revenue recognition template."[8] Shortly thereafter, the Lineup representative stated "[t]he revenue recognition template is separate from the accounting rules. The revenue recognition template says, based upon the ad or the service in context, when should I determine that that will be put into a [general ledger] at invoicing."[9]

Throughout the remainder of the October Demo, Lineup repeatedly represented and demonstrated Adpoint's ability to distinguish revenue recognition

---

[7] *Id.* ¶ 10.
[8] *Id.* ¶ 11.
[9] *Id.* ¶ 12.

and billing options.[10]   The October Demo concluded with a demonstration of separated revenue recognition, just as Lee needed to bill a customer for a particular line item.[11]

Lee made its interest in the revenue recognition template known and stated that the "revenue recognition template would be really interesting to this group. Because a lot of folks in this group are being tasked with[,] you know[,] how do we set the systems up so it hits all of the right [general ledgers] and our scale is[,] you know[,] quite a bit."[12]

On November 15, 2021, Lineup addressed additional questions from Lee's finance team (the "November Demo" and together with the October Demo, the "Demonstrations").[13]   Lee wanted further clarity on Adpoint's ability to segregate duties among different finance users, especially as to audit controls and security.[14] In response, Lineup stated "Adpoint is very permission based.  Lots of very granular permissions.  So, even within your finance team you won't have all finance users having the same level access to the system[.]"[15]

---

[10] *Id.* ¶¶ 13–15.

[11] *Id.* ¶ 15 (Lineup in explaining the demonstration stated, "that is an example of the revenue recognition, separated completely from the function of how you would bill the customer for that line item.").

[12] *Id.* ¶ 16.

[13] *Id.* ¶ 17.

[14] *Id.*

[15] *Id.* ¶ 18.

**C.**     *The contracts*

On March 9, 2022, the parties entered into a Master Service Agreement (the "MSA").[16]  The MSA governs Lee's subscription to Adpoint and contemplated a statement of work that addressed services and deliverables, which was ultimately executed by the parties on July 5, 2022 (the "SOW").[17]

**1.     *The MSA***

Section 1 of the MSA defines several terms:

- "Subscription" to Adpoint is defined as the "subscription provided by Lineup and made available to [Lee] for use of [Adpoint], as set forth in… [the SOW]";[18]

- "Deliverables" is defined as "those specifically identified items that Lineup creates for or provides to [Lee] pursuant to a [SOW], as specifically set forth in the [SOW]";

- "Professional Services" is defined as "the deployment, configuration, development, testing, and other consulting related to [Adpoint] performed by Lineup's Personnel and set out in the [SOW]";

---

[16] Compl. ¶ 7; Ans. ¶ 7; D.I. 22 Ex. 1 (MSA).
[17] Compl. ¶ 8; Ans. ¶ 8; D.I. 22 Ex. 2 (SOW).
[18] Unless otherwise defined, capitalized terms in this decision shall have the meaning ascribed to them in the parties' agreements.

- "Support" is defined as "the support provided by Lineup to ensure software functions in accordance with [the MSA] as set forth in Schedule 2"; and

- "Services" is defined as "the Professional Services, Subscription, and Support, collectively[]" (together with Deliverables, "Services and Deliverables").[19]

Section 5 governs Professional Services and Section 5.2 obligates Lineup to "use commercially reasonable efforts to comply with any work schedule specified in the [SOW]."[20]

Section 6 addresses acceptance and rejection of Services and Deliverables, providing that "[Lee] shall accept or reject each discrete Deliverable or Professional Services within ten (15) [*sic*] business days of installation of the same. If [Lee] fails to reject a deliverable within ten (15) [*sic*] day period, [Lee] will be deemed to have fully accepted the Deliverables and Professional Services."[21] Upon a rejection of Deliverables by Lee, Lineup must provide non-defective Deliverables. If Lineup is unable to provide non-defective Deliverables "[Lee] shall be entitled to recover the fees paid to Lineup for the deficient…Deliverables for such [SOW], but not under any other [SOW] or any other damages."[22]

---

[19] MSA § 1.
[20] *Id.* § 5.2.
[21] *Id.* § 6.
[22] *Id.*

Lineup further agreed to provide Lee "the Services and Deliverables as more specifically set forth [in the SOW],"[23] and under Section 11.1(ii), Lineup warranted that "it will provide the Services and Deliverables in good faith, in accordance with the applicable [SOW]…, consistent with the standard of care applicable to the [Software as a Service] [("]SaaS["])] industry, and in compliance with the laws, regulations and standard applicable to the Services."[24]

If Lee wishes to alter Services and Deliverables, as set forth in the SOW, Section 10 of the MSA provides a mechanism to do so ("Change Request").[25] Upon Lee's submission of a Change Request, Lineup, in its discretion, can accept the Change Request, propose modifications to it, or reject the proposed Change Request.[26] If Lineup accepted the Change Request, the Change Request "shall be deemed incorporated into the applicable [SOW]."[27]

Schedule 2 of the MSA governs service levels and Support. Section 1.1(a) of Schedule 2 states "Lineup shall provide [Adpoint] on a [SaaS]…basis pursuant to the Subscription."[28] Section 1.1(b) obligates Lineup to "use commercially reasonable efforts to ensure that [Adpoint] is connected and available to [a]uthorized

---

[23] *Id.* § 2.
[24] *Id.* § 11.1(ii).
[25] *Id.* § 10.
[26] *Id.* § 10.2.
[27] *Id.* § 10.2(i).
[28] MSA, Schedule 2 ("Schedule 2") § 1.1(a).

[u]sers 24 hours a day, 7 days a week, with an availability rate of 99.5%, measured per calendar month."[29]

To ensure that Adpoint was connected and available, Section 1.4 of Schedule 2 obligates Lineup to "provide a Help Desk service to allow [Lee] to report faults in [Adpoint].[30] Section 1.5, titled "Support and Maintenance of the Software," classifies such faults by priority, "based upon the fault's impact on [Adpoint's] availability."[31] The classifications operate as a mechanism "to determine the target response time for Lineup to contact [Lee], and the target restore time for the fault to be resolved."[32] In the context of classifying faults, the MSA uses the terms "Core Functionality," "Workaround," and "Restore." "'Core Functionality' is defined as the ability to create 'new customers', the ability to create new 'orders', the ability to create new ad bookings, and the ability to generate 'invoices'. All other features of [Adpoint] shall be deemed 'Non-Core Functionality.'"[33] A total service outage was the top priority (P1), with faults encompassing Core Functionality being the second

---

[29] *Id.* § 1.1(b).
[30] *Id.* § 1.4(a).
[31] *Id.* § 1.5(a).
[32] *Id.* (identifying classifications of P1 (response time of 30 minutes or less and Restore time within 4 hours), P2 (response time of 30 minutes or less and Restore time within 8 hours), P3 (response time of 1 hour or less and Restore time within 2 days), and P4 (response time of 4 hours or less and Restore time within "commercially reasonable efforts")).
[33] *Id.* § 1.5(b).

highest priority (P2), with a quicker response and restore time than lower priority faults.[34]

Under Section 4.2(i) of the MSA, "[i]f [Adpoint] does not conform in accordance with [Schedule 2], Lineup will, at its expense, use commercially reasonable efforts to correct any such non-conformance promptly, or provide [Lee] with an alternative means of achieving functionality of [Adpoint]."[35]

The MSA also contains a standard integration clause, providing:

> [The MSA], together with the…[SOW]…, constitute the complete agreement between the Parties with respect to the subject matter hereof and supersede all previous and contemporaneous agreements, proposals, or representations written or oral, concerning the subject matter of [the MSA]. In the event of any inconsistency…the terms of [the MSA] shall control unless such additional documents specifically state that they control over [the MSA] and is signed by the [p]arties.[36]

### 2.    *The SOW*

The SOW "outline[s] the project approach…and… list[s …] deliverables agreed [to] during the proposal process."[37] Section 5, titled "Project Scope," states that "the Project Scope has been based on [s]ales [d]emonstrations of Adpoint and in-depth conversations with Lee []."[38]

---

[34] *Id.* § 1.5(a).
[35] MSA § 4.2(i).
[36] *Id.* § 24.3.
[37] SOW § 3.
[38] *Id.* § 5.

SOW Section 11 provides a comprehensive list of Deliverables.[39]  Relevant here, this includes "the ability to define a billing type, billing schedule and separate out revenue recognition[]"[40] and "[t]he ability to define account codes and accounting rules which Adpoint can use to create journals."[41]  Under Section 13.11, the parties further agreed that Adpoint's settings would "be built to reflect [Lee's] business structure and segregation of data.  For example, restricting certain functions to certain roles, and allowing global access to data for management team members."[42]

**D.     *Lee discovers Adpoint's deficiencies***

In early 2023, Lineup made Adpoint available to Lee for testing.  Lee's testing revealed issues with Adpoint finance modules, including the features discussed during the Demonstrations.[43]  Adpoint was unable to record different revenue recognition models.[44]  Rather, revenue recognition was tied to the billing option— the opposite of what had been presented—effectively eliminating the flexibility that attracted Lee to Adpoint.[45]

---

[39] *Id.* § 11.
[40] *Id.* § 11.2.3.
[41] *Id.* § 11.2.10.
[42] *Id.* § 13.11.
[43] Countercl. ¶ 24.
[44] *Id.* ¶ 25.
[45] *Id.*

That theme continued for much of the other features demonstrated by Lineup. This included the ability to segregate permissions among users, leaving a vital audit and security internal control, unenforceable.[46]

## E.   *The Change Requests*

Lineup characterized the deficiencies as out-of-scope—despite the presentation of these features during the Demonstrations—but functions that could be provided through a Change Request.[47]   Hoping to solve the deficiencies, Lee agreed to submit Change Requests that matched the functions presented during the Demonstrations but failed to materialize in the Adpoint system delivered by Lineup.[48]

The Change Requests operated as an amendment to the MSA and SOW with respect to the subject matter of the Change Request.  Unless "specifically amended or supplemented," however, the terms of the MSA and subsequent agreements "remain unchanged and in full force and effect."[49]

On June 9, 2023, Lee submitted a Change Request requesting the granular permissions as they were described during the November Demo and required for Lee to segregate duties.[50]  Specifically, Lee requested "permissions to restrict users from

---

[46] *Id.* ¶ 26.
[47] *Id.* ¶¶ 31–32.
[48] *Id.* ¶ 27.
[49] D.I. 22 Ex. 3 (Change Request) § 8.1.1.
[50] Countercl. ¶¶ 28, 18–19.

creating cash batches for certain banks, permissions to reallocate[] receipts, permissions to modify ads for customers on the blocked customer list, and permissions to restrict invoice adjustments."[51]

That Change Request also contains an integration clause, stating in relevant part, "[t]his [Change Request] supersedes all proposals or other prior agreements, oral or written, and all other communications between the parties relating to the subject matter described in the [Change Request]."[52]

Ultimately, contradicting the system's capabilities presented during the Demonstrations and later discussed during Change Request negotiations, it was revealed that Adpoint not only lacked the ability to provide the functions demonstrated, but that Lineup lacked the capability to develop software that could do so.[53] Rather than receive the Adpoint software as presented, Lee received a delayed roll-out of Adpoint, delivered piecemeal, with continued deficiencies discovered only after significant investment of resources.[54]

---

[51] *Id.* ¶ 28.
[52] Change Request § 8.1.1.
[53] Countercl. ¶¶ 34–35.
[54] *Id.* ¶¶ 1, 33, 35.

**F.**     *Procedural History*

After Lineup filed its Complaint,[55] Lee answered and filed its Counterclaim asserting: fraudulent inducement (Count I);[56] fraudulent concealment (Count II);[57] in the alternative, breach of contract (Count III);[58] and attorneys' fees (Count IV).[59]

Lineup responded to the Counterclaims with the Motion, seeking to dismiss Counts I–III.[60]

## III.   PARTIES' CONTENTIONS

Lineup makes three arguments to defeat the fraud claims. First, the MSA's integration clause bars the claims because the MSA conflicts with the alleged fraudulent representations.[61] Second, Lee fails to plead that Lineup had knowledge of the alleged misrepresentation of Adpoint[62] or that Lineup engaged in an affirmative act of concealment.[63] Third, the fraudulent inducement claim is impermissibly bootstrapped to the breach of contract claim.[64]

---

[55] Compl.
[56] Countercl. ¶¶ 36–41.
[57] *Id.* ¶¶ 42–46.
[58] *Id.* ¶¶ 47–52.
[59] *Id.* ¶¶ 53–55.
[60] *See generally* D.I. 22 ("Mot.").
[61] *Id.* at 10–18.
[62] *Id.* at 18–20.
[63] *Id.* at 22–25.
[64] *Id.* at 20–22.

As to Lee's breach of contract claim, Lineup argues that Lee asserts conclusory allegations, unsupported by facts.[65] And further argues that the Change Requests, which amend the MSA and SOW, show that there were no contractual breaches.[66]

Lee responds that the integration clause does not bar its fraud claims because Lineup's fraudulent misrepresentations do not conflict with the MSA.[67] Lee argues that it sufficiently alleges scienter and concealment.[68] And, Lee asserts, its fraudulent inducement claim is not impermissible bootstrapping because its claim is based on precontractual misrepresentations and seeks damages different than it seeks on the breach of contract claim.[69]

Finally, Lee argues that it adequately pleads a breach of contract, supported by sufficient facts.[70] Lee also contends that Change Requests did not relieve Lineup of its contractual obligations under the MSA provisions at issue.[71]

## IV. STANDARD OF REVIEW

On a motion under Superior Court Civil Rule 12(c) for judgment on the pleadings,[72] "the 'Court's review is limited to the contents of the pleadings' and

---

[65] *Id.* at 25.
[66] *Id.* at 27.
[67] D.I. 29 (Answering Brief ("AB")) at 16–20.
[68] *Id.* at 22–25, 28–32.
[69] *Id.* at 26–27.
[70] *Id.* at 32–34.
[71] *Id.* at 34.
[72] Super. Ct. Civ. R. 12(c).

documents incorporated therein."[73]  "The Court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party."[74]  "The standard for a motion for judgment on the pleadings is 'almost identical' to the standard for a motion to dismiss."[75]  "The motion will be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[76]

A motion for judgment on the pleadings "is a proper framework for enforcing unambiguous contracts, which have only one reasonable meaning and therefore do not create material disputes of fact."[77]  The Court, however, will not grant a motion for judgment on the pleadings if the nonmovants interpretation of the contract is reasonable.[78]

## V.   ANALYSIS

### A.   *The fraud claims*

Lee asserts two fraud claims, fraudulent inducement (Count I) and fraudulent concealment (Count II).  The elements of fraudulent inducement are: "1) a false

---

[73] *Textron Inc. v. Endurance Am. Ins. Co.*, 346 A.3d 639, 646 (Del. Super. 2025) (quoting *W. Coast Opportunity Fund, LLC v. Credit Suisse Sec. (USA), LLC*, 12 A.3d 1132 (Del. 2010)).

[74] *Plume Design, Inc. v. DZS, Inc.*, 2023 WL 5224668, at *4 (Del. Super. Aug. 10, 2023).

[75] *Pangea Equity Partners, LP v. Great Am. Ins. Grp.*, 2025 WL 786050, at *5 (Del. Super. Mar. 12, 2025).

[76] *Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 925 (Del. 2017).

[77] *Bay Point Cap. P'rs. L.P. v. Fitness Recovery Holdings, LLC*, 2021 WL 5578705, at *4 (Del. Super. Nov. 30, 2021).

[78] *Village Practice Management Co., LLC v. West*, 342 A.3d 295, 313 (Del. 2025).

statement of misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result."[79]

The elements of fraudulent concealment are:

(1) deliberate concealment by a party of material past or present fact, or silence in the face of a duty to speak; (2) that party acted with scienter; there was an intent to induce reliance by the claimant upon the concealment; (4) causation; and (5) damages resulting from the concealment.[80]

Lineup advances several arguments for dismissal.

### 1. *The integration clause does not bar Lee's fraud claims.*

An adequately pled fraud claim must establish justifiable reliance upon the defendant's false representation.[81]  Delaware, in accordance with its respect for parties' freedom of contract, allows parties to craft contractual provisions that insulate either, or both, from the other party claiming justifiable reliance on precontractual representations.[82]  But "Delaware will enforce only 'clear anti-reliance clauses' where the part[ies] ha[ve] unambiguously 'contractually promised

---

[79] *ITW Glob. Invs. Inc. v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Mar. 6, 2017).

[80] *Chesapeake Ins. Advisors, Inc. v. Desola*, 2018 WL 565306, at *4 (Del. Super. Jan. 24, 2018) (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 148 (Del. 1987)).

[81] *Johnson & Johnson v. Fortis Advisors LLC*, — A.3d —, 2026 WL 89452, at *32 (Del. 2026) (citations omitted).

[82] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1035 (Del. Ch. 2006).

that [they] did not rely upon statements outside the contract's four corners in deciding to sign the contract.'"[83]  Thus, "'standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations.'"[84]

Even absent an anti-reliance clause, the parol evidence rule will preclude a fraud claim where the extracontractual representation directly conflicts with express contractual language.[85]  Put another way, an integration clause does not bar reliance on misrepresentations outside the four corners of an agreement, "it precludes reliance on precontractual understandings of facts that are within the four corners of that agreement."[86]  Thus, where the parties' agreement contains only a standard integration clause, the relevant inquiry is whether the alleged extracontractual fraudulent representations directly conflicts with an express provision in the contract.[87]

---

[83] *Johnson & Johnson*, 2026 WL 89452, at \*32 (quoting *Abry*, 891 A.2d at 1059 (citation omitted)).
[84] *Id.*
[85] *Park7 Student Housing, LLC v. PR III/ Park7 SH Holdings, LLC*, 340 A.3d 614, 618–619 (Del. Ch. 2024); *see also Trifecta Multimedia Holdings, Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450 (Del. Ch. 2024) ("While a standard integration clause alone will not bar a fraudulent inducement claim, a standard integration clause does bar the admission of extrinsic evidence 'for the purpose of varying or contradicting the terms of that contract.'") (citation omitted).
[86] *Park7*, 340 A.3d at 618–19.
[87] *Id.* at 618. *Park7* is instructive on the type of direct conflict necessary to bar fraud claims based solely on an integration clause.  In *Park7*, the Court of Chancery dismissed a fraudulent inducement claim where the parties' agreement directly contradicted precontractual representations and contained an integration clause.  The precontractual representation concerned a statement that defendants assured plaintiff that it would be granted "as many extensions" as were "needed for it" to comply with certain post-closing obligations. *Id.* at 616.  The agreement, however, only allowed plaintiff "a one-time right to extend." *Id.* at 617.  The *Park7* court reasoned

There is no dispute that the agreements do not contain an anti-reliance clause. Lineup relies solely on the MSA's integration clause to argue that where, as here, a contract contains a broad integration clause, it is sufficient to render any reliance on extracontractual representations, unreasonable.[88] Lineup contends that the alleged fraudulent misrepresentations are directly contradicted by the terms of the MSA and subsequent Change Requests.

The purported conflict is found in the term "core functionality." According to Lineup, Lee claims that Lineup made fraudulent misrepresentations "as to the inherent, core functionalities of Adpoint."[89] Lineup's reasoning is that Lee cannot claim to have been fraudulently induced as to the core functionalities of Adpoint because the MSA explicitly defines Core Functionalities and the functions about which Lee complains are not core functionalities.[90] Lineup, however, mischaracterizes Lee's argument and misconstrues the MSA.

Lineup's position is premised on Core Functionality in the MSA meaning the essential (core) features that were negotiated between the parties. From this starting point, Lineup argues that the features Lee contends were missing from Adpoint were non-core (and thus not Core Functionalities) that Lee did not request until after

---

that the plain language of the agreement afforded only one right of extension, therefore the plaintiff could not justifiably rely on precontractual statements of unlimited extensions. *Id.* at 620.

[88] Mot. at 10.

[89] *Id.* at 16.

[90] *Id.* at 17–18.

delivery of Adpoint. According to Lineup, Lee changed its desires, which is why Change Requests were needed to add these additional features.

Lineup's argument contorts the MSA's definition. It does not mean the essential features negotiated between the parties. Reading the contract objectively, as the Court must do,[91] Core Functionalities is a triage term—used to assess the urgency of faults in Adpoint. Core Functionality is defined in Schedule 2 of the MSA, which largely governs Adpoint's connectivity to the "underlying database" and services offered by Lineup to regain functionality when a fault occurs. For example, Section 1.1(b) requires Lineup to "use commercially reasonable efforts to ensure that the Software is connected and available to Authorized Users 24 hours a day, 7 days a week…."[92] Lineup is also required to remotely monitor the Software[93] and provide Help Desk services 24 hours a day[94] and when faults occur, Lineup is required to classify the fault,[95] which will be responded to in the time-periods specified in Section 1.5.[96] Faults in Core Functionality have the highest priority (and quickest response time), while Non-Core Functionality faults are categorized as "Non-urgent" or "Low."[97] In this context, Core Functionality is not an all-

---

[91] *Bitgo Holdings, Inc. v. Galaxy Digital Holdings, Ltd.*, 319 A.3d 310, 322 (Del. 2024).
[92] Schedule 2 § 1.1(b).
[93] *Id.* § 1.3.
[94] *Id.* § 1.4.
[95] *Id.* § 1.4(c).
[96] *Id.* § 1.5
[97] *Id.*

encompassing term that captures each function of Adpoint (as Lineup urges), and thus, does not contradict Lineup's representations during the Demonstrations.

The SOW bolsters this conclusion. The MSA explicitly contemplates that a comprehensive list of Deliverables "agreed during the proposal process" will be identified in the SOW.[98] Section 5 of the SOW provides that "the Project Scope has been based on *Sales Demonstrations of Adpoint and in-depth conversations with Lee* []."[99] Consistent with its stated purpose, the SOW outlines the Deliverables of a "standard Adpoint system" including the ability to separate out revenue recognition from billing type[100] and Adpoint's system settings ability to restrict certain functions from certain roles.[101] Thus, the SOW—not the MSA's Core Functionality (a triage term)—governs the expected Deliverables and functions of Adpoint. And not only does the SOW not conflict with the representations made during the Demonstrations, it expressly acknowledges them.[102]

Lineup's reliance on Change Requests fairs no better. It argues that the Change Requests "underscore[] that a change from the MSA was needed in order

---

[98] *Id.* §§ 1, 3.

[99] SOW § 5 (emphasis added).

[100] *Id.* § 11.2.3.

[101] *Id.* § 13.11.

[102] The parties take opposing views as to whether the Demonstrations were affirmatively incorporated in the SOW. AB at 18; D.I. 36 (Reply Brief) at 13–16. The Court need not come to a conclusion on these competing contentions because justifiable reliance necessary to plead a fraud claim does not rise or fall with the Demonstrations' incorporation. The Court opts for the narrower path here and only finds that the Demonstrations were not contradicted by the MSA, SOW, or subsequent Change Requests.

22

for Lee to request additional functions that it wanted."[103]  Effectively, Lineup asks the Court to immunize its alleged fraud because Lee sought Change Requests to bring the Adpoint system it received in compliance with the functionality that was represented during the Demonstrations.  As explained, "any waiver of extra-contractual fraud must be effectuated through 'unambiguous anti-reliance language' from the party seeking to rely on extra-contractual statements."[104]  None of the parties' agreements contain such a provision, therefore Lineup cannot "'escape the responsibility for its own [alleged] fraudulent representation made outside of the agreement's four corners,'"[105] at this stage of the proceedings.

## 2. *Lee's fraud claims satisfy Rule 9(b)'s particularity requirement.*[106]

Superior Court Civil Rule 9(b) requires a plaintiff to plead fraud with particularity as "to the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what the person(s) gained from making the misrepresentation."[107]

---

[103] Mot. at 17.

[104] *Johnson & Johnson* 2026 WL 89452, at *32 (quoting *Abry*, 891 A.2d at 1059).

[105] *Id.*

[106] Lee contends that Lineup waived its argument as it pertains to Rule 9(b)'s particularity requirement because it did not explicitly raise Rule 9(b) in its affirmative defenses.  AB at 15.  The Court does not reach the merits of Lee's contention because, as explained below, Lee's claims satisfy Rule 9(b).

[107] *Valley Joist BD Holdings, LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021).

### a. *Lee sufficiently alleges scienter.*

While fraud requires particularity, Rule 9(b) permits "knowledge and other condition of mind of a person [to] be averred generally."[108] Even so, there must be sufficient well-pled facts "'from which it can reasonably be inferred that…something was knowable and that the defendant was in a position to know it.'"[109] And, "[u]nder Delaware law, scienter is satisfied if the defendant knew its representation was false or made it with reckless indifference to the truth[.]"[110]

Lineup argues that Lee's fraudulent inducement claim lacks factual allegations to support a reasonable inference of scienter.[111] Lee alleges that Lineup, as developer of Adpoint, knew the system's capabilities and that Lee desired a comprehensive software platform, with specific features. Despite the knowledge that Adpoint could not deliver the services Lee's RFPs requested, Lineup orchestrated live demonstrations and provided solution design documents that purported to represent an Adpoint system with the finance solutions that Lee needed. The Counterclaim sufficiently pleads facts supporting a reasonable inference of scienter.

---

[108] Super. Ct. Civ. R. 9(b).

[109] *Valley Joist*, 269 A.3d at 988 (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208 (Del. Ch. 2006)).

[110] *Johnson & Johnson*, 2026 WL 89452, at *30.

[111] Mot. at 18–20.

Lineup further argues that Lee cannot claim that Lineup knew of Adpoint's deficiencies because "[a] party cannot plausibly allege that a counterparty knowingly misrepresented that a function was already included in an agreement when the party later formally amended that agreement to add the same function."[112] That argument conflates false contractual representations with the type of precontractual allegations of fraudulent inducement alleged here. Whether the functions presented in the Demonstrations were later agreed to as part of the Change Request, or not, does not negate the alleged factual misrepresentations made before entering into the contract. That is, simply because Lee entered into Change Requests does not negate the knowledge (or, at a minimum, reckless indifference) that Lineup had at the time of making the alleged misrepresentations.[113]

### b. *Lee sufficiently alleges an affirmative act of concealment.*

"The gravamen of a fraudulent concealment claim is an affirmative act of concealment by a defendant–an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put the plaintiff off the trail of inquiry."[114] To plead an affirmative act of concealment, a plaintiff's allegations must support a reasonable inference that the defendant engaged in an

---

[112] *Id.* at 18.
[113] *See Johnson & Johnson*, 2026 WL 89452, at *30 (measuring scienter at the time the misrepresentation was made).
[114] *Renovaro Inc. v. Gumrukcu*, 2025 WL 3134533, at *8 (Del. Ch. Nov. 7, 2025) (internal quotation marks and citations omitted).

action designed or intended to prevent the discovery of facts giving rise to a fraud claim.[115] Active concealment must be more than just silence, "but not much more[.]"[116] It "can be as small as 'a single word, even a nod or a wink or a shake of the head or a smile or gesture intended to induce another to believe in the existence of a nonexisting fact….'"[117] Rule 9(b) requires that active concealment be alleged with particularity.[118]

Lineup argues that Lee fails to allege active concealment.[119] Lee's allegations, however, describe Lineup's effort to curate demonstrations of a software meeting Lee's stated needs. Then, when the Adpoint system failed to perform and Lee confronted Lineup about the deficiencies, Lineup relabeled the functions demonstrated as "more advanced," requiring Change Requests. Characterizing the Change Requests as necessary, Lee argues, allowed Lineup to further delay delivery of Adpoint, disguising Adpoint's deficiencies and Lineup's inability to cure them.

Lee further supports its allegations with specific points in the October Demo when the misrepresentations were made (approximately 40 minutes; 1 hour 14 minutes; 1 hour 17 minutes; 1 hour 20 minutes; 1 hour 21 minutes) and the contents of the misrepresentations, gives specific dates when the Adpoint system was initially

---

[115] *Id.* at *9.
[116] *Johnson & Johnson*, 2026 WL 89452, at *29.
[117] *Id.* (quoting *Nicolet*, 525 A.2d at 149).
[118] *Renovaro Inc.*, 2025 WL 3134533, at *9.
[119] Mot. at 23.

made available to Lee and when the specific deficiencies were discovered. Lee further provides facts of Lineup's response after the deficiencies were discovered, details the Change Requests process, and describes Lineup's position that the Change Requests were necessary and would ultimately rectify the complained of deficiencies. Those allegations survive Rule 9(b)'s particularity requirement.

Lineup next argues that the plain language of the MSA defeats Lee's fraudulent concealment claim because Lee's concealment claim relies on the "recast[ing] [of] missing core functionality as out-of-scope enhancement issues, requiring new Change Requests."[120]

Again, Lineup relies on the defined term Core Functionalities to assert that it could not have concealed core functionalities because the MSA addressed them.[121] Therefore, Lineup continues, Lee's allegations that Lineup used the Change Requests to further conceal its alleged fraud fails because Lineup did not recast the Core Functionalities as defined in the MSA.[122]

---

[120] Countercl. ¶ 31; Mot. at 23.

[121] Mot. at 23.

[122] *Id.* Lineup additionally contends that allegations of its delayed rollout of Adpoint are refuted by Section 5.2 of the MSA. *Id.* Section 5.2 states, in relevant part, that "[t]he parties acknowledge that schedules are estimates and not a binding commitment that schedules will be met." MSA § 5.2. But Lee's allegations go beyond a mere delay, it alleges that Adpoint was rolled out in piecemeal as an artifice to further disguise Lineup's inability to cure Adpoint's deficiencies. That allegation does not falter simply because the parties agreed that scheduled estimates would not be binding.

Lineup's argument fails for the same reason stated above. Core Functionalities does not have the meaning Lineup attempts to ascribe to it—it is used to reference higher priority system faults.

### 3. *Lee is not impermissibly bootstrapping its breach of contract claim.*

Lineup's final attack against Lee's fraudulent inducement claim invokes the anti-bootstrapping rule. The purpose of the anti-bootstrapping rule is "to prevent what would amount to a double recovery for the same alleged wrongdoing under both tort and contract theories of liability."[123] Functionally, the "rule bars a fraud claim where the plaintiff merely adds the term fraudulently induced to a complaint or alleges that the defendant never intended to comply with the agreement at issue at the time the parties entered into it[.]"[124] But "the anti-bootstrapping rule does not prevent parties from bringing a fraud claim if…the conduct occurs prior to the execution of the contract and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction."[125]

Lineup argues that the allegations of fraudulent inducement do not go beyond mere non-performance of a contract and are thus, the product of a breach of contract claim.[126] Lee's fraudulent inducement claim, however, is premised on a different

---

[123] *Mosaic US Holdings LLC v. Atlas Tech. Sols.*, 2025 WL 483064, at *6 (Del. Super. Jan. 22, 2025).

[124] *Levy Family Investors, LLC v. Oars + Alps LLC*, 2022 WL 245543, at *8 (Del. Ch. Jan 27, 2022) (internal quotation marks and citations omitted).

[125] *Id.* (cleaned up).

[126] Mot. at 21.

factual scenario, setting forth a pattern of conduct occurring prior to the execution of the MSA. Namely, Lee claims that in response to its RFPs, Lineup presented a software that would meet Lee's needs. The Demonstrations, however, were false when made and did not accurately represent the Adpoint system that would ultimately be delivered. Those allegations describe conduct that occurred "prior to the execution of [the MSA] and thus with the goal of inducing [Lee's] signature and willingness to close on the transaction[.]"[127]

Even so, a "failure to plead separate damages is an independent ground for dismissal."[128] To survive, a fraud claim pled contemporaneously with a claim for breach of contract must seek "damages that are qualitatively different from those available for breach of contract."[129] But, "at the pleading stage, a plaintiff is not required to articulate exactly how the fraud and breach of contract damages diverge."[130] And where a plaintiff "might be entitled to greater damages through its fraud claim," the anti-bootstrapping rule does not apply.[131]

---

[127] *Levy Family Investors*, 2022 WL 245543, at *8; *see also In re Bracket Holding Corp. Litig.*, 2017 WL 3283169, at *9 (Del. Super. July 31, 2017) ("Generally, allegations focused on the inducement to contract…avoid[] the bootstrapping doctrine.").

[128] *Driven Intermediate Holdings, Inc. v. Jimenez*, 2025 WL 2631622, at *4 (Del. Super. Aug. 28, 2025).

[129] *WIA Holdings LLC v. Scottish Am. Cap. LLC*, 2026 WL 147457, at *13 (Del. Ch. Jan. 20, 2026).

[130] *Partners & Simons, Inc. v. Sandbox Acquisitions, LLC*, 2021 WL 3159883, at *5 (Del. Ch. July 26, 2021).

[131] *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at *12 (Del. Ch. Aug. 25, 2020).

Here, Lee seeks contractual damages in the amount paid to Lineup.[132] The fraudulent inducement claim seeks additional damages, including the amount it paid to its own employees in an attempt to discover and resolve Adpoint's issues and the costs to hire outside consultants to address the very accounting issues that Adpoint purported to, but allegedly did not, solve.[133]

For now, Lee has sufficiently differentiated its breach damages from its fraudulent inducement damages to survive the anti-bootstrapping rule.[134]

**B.** *The breach of contract claim*

In the alternative, Lee asserts breach of contract. An adequately pled breach of contract claim must demonstrate: (1) the existence of the contract; (2) the breach of an obligation imposed by that contract; and (3) that the plaintiff suffered damages as a result of the breach.[135] "In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains a short and plain statement of the claim showing that the pleader is entitled to relief."[136] The allegations "must only give the defendant fair notice of a claim and is to be liberally construed."[137] A complaint that

---

[132] Countercl. ¶ 52.
[133] Countercl. ¶ 41.
[134] *Am. Auto. Ass'n of N. Calif. v. Barnes Assocs., Inc.*, 2020 WL 4729063, at *5 (Del. Ch. Aug. 13, 2020) ("It is simply not the case that damages in tort are generally likely to be co-extensive with damages in contract, and at a minimum, it is not possible to say that at the pleading stage.").
[135] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).
[136] *Id.* at 611 (internal quotation marks and citations omitted).
[137] *Id.* (citing *Michelson v. Duncan,* 407 A.2d 211, 217 (Del. 1979)).

gives fair notice "shifts to the defendant the burden to determine the details of the cause of action by way of discovery for the purpose of raising legal defenses."[138]

There is no dispute over the first and third elements. Lineup challenges the second element and contends that Lee fails to adequately plead the breach of an obligation for two reasons: First, Lee fails to allege a specific contractual provision that was breached, relying instead on citations to general provisions in the agreements. Second, Lee's allegations of breach are refuted by the Change Requests.[139]

Lee's alleged breaches of the MSA, SOW, and Change Requests are rooted in Lineup's alleged failure to deliver a functioning Adpoint software service and the Counterclaim cites to several sections of the MSA.[140] Delaware's pleading standard is minimal notice pleading; pleading particularized facts is not required. With the factual allegations, referenced above, Lee sufficiently alleges a breach of contract. It is not required to allege which specific provisions were breached.

In any event, Lee did provide some examples. For instance, under Section 11.1(ii) of the MSA, Lineup warranted that "it will provide the Services and

---

[138] *Id.* (quoting *Klein v. Sunbeam Corp.,* 94 A.2d 385, 391 (Del. 1952)).
[139] Mot. at 25–28.
[140] Countercl. ¶ 50 (Citing Sections 4.2(i), 5.2, 6, 10.2(i), and 11.1(ii)).

Deliverables in good faith, in accordance with the terms of the applicable [SOW], consistent with the standard of care to the SaaS industry…."[141]

The Court agrees with Lineup's second contention that Lee cannot now rely on the Services and Deliverables contracted for in the SOW but were subsequently addressed in a Change Request.[142]  And, as Lee alleges, Change Requests were submitted "across every major finance capability[.]"[143]  But the Change Requests did not amend Lineup's warranty in Section 11.1(ii), but rather amended Services and Deliverables as set forth in the SOW.[144]  It is reasonably conceivable that failure to deliver functions requested in the Change Request, as alleged, is both a failure by Lineup to deliver Adpoint services in good faith, and is inconsistent with the standard of care in the SaaS industry, thereby breaching the MSA.

Similarly, Section 6 states that if "Lineup is unable to…provide non-defective Deliverables, [Lee] shall be entitled to recover the fees paid to Lineup for the deficient…Deliverables for such [SOW], but not under any other [SOW] or any damages."[145]  The Change Requests supersede the relevant SOW, but Lee's core allegation as to breach is that it never received a non-defective Adpoint product.  As

---

[141] MSA § 11.1(ii).
[142] *See Maka v. Musial*, 2025 WL 1744936, at *8 (Del. Super. June 11, 2025).
[143] Counter Cl. ¶ 30.
[144] MSA §§ 1 (defining Change Request as "the document requesting a change(s) in the Services and Deliverables."), 10.1.
[145] *Id.* § 6.

alleged, it is reasonably conceivable that Lineup breached its obligation to provide "non-defective" Deliverables.

Lineup retorts that Lee's failure to allege that it rejected a Deliverable within 15 days precludes its claim for breach of Section 6.[146] But Section 6's requirement of acceptance or rejection within 15 days says nothing to that effect. And to the contrary, Section 24.4 states

> [t]he failure of either [p]arty to take action as a result of a breach of [the MSA] by the other [p]arty shall constitute neither a waiver of the particular breach involved nor a waiver of any right to enforce any or all provisions of [the MSA] through any remedy by law, equity or [the MSA].[147]

Thus, even if Lee failed to reject Deliverables within Section 6's 15-day requirement, that failure does not operate as a waiver to a claim of breach.[148]

The Court need not address any other cited sections because Lee stated a claim for breach of contract and the burden now shifts to Lineup to determine the details through discovery. Accordingly, the Motion as to the breach of contract claim is **DENIED**.

---

[146] Mot. at 26–27.
[147] MSA § 24.4.
[148] *See Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *30 (Del. Super. July 29, 2021) (reasoning that defendant did not waive its challenge to an escrow funds' release despite a contractual provision requiring objection to its release within 30 days because under the operative agreement's no waiver provision, a failure to exercise a right under the agreement did not operate as a waiver of the unexercised right).

## VI. CONCLUSION

An integration clause, absent anti-reliance language, does not preclude reliance on extracontractual misrepresentations unless those misrepresentations are directly contradicted by the subsequent written agreement. The misrepresentations here are not contradicted by the parties' agreements and thus are not barred by the integration clause. Additionally, because the fraud claims are adequately pled and do not constitute impermissible bootstrapping, Lineup's Motion to dismiss these claims is DENIED.

Lineup's Motion as to the breach of contract claim is also DENIED because Lee pleads facts that support a reasonably conceivable breach of Lineup's obligations under the MSA and Change Request.


**IT IS SO ORDERED**.

*/s/Kathleen M. Miller*
Kathleen M. Miller, Judge